UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                     Case No. 07-44312-SWR

**DEBRA L. KELLEY,**                       Chapter 7

     Debtor.                              HON. STEVEN W. RHODES
_____/


## MEMORANDUM IN SUPPORT OF UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)(2) AND (3) AND IN RESPONSE TO DEBTOR'S ANSWER THERETO


     **SAUL EISEN, United States Trustee for Michigan and Ohio,** hereby submits his

Memorandum in Support of his Motion to Dismiss Pursuant to 11 U.S.C. § 707(b)(2) and

in Response to Debtor's Answer Thereto.

## STATEMENT OF THE CASE

     The United States Trustee moved to dismiss the Chapter 7 bankruptcy case of Debra L.

Kelley ("Debtor") under 11 U.S.C. § 707(b)(2) and (3), asserting that it would be an abuse of

Chapter 7 to grant the Debtor a discharge. The United States Trustee's motion is based, in part, on

the statutory presumption, codified under 11 U.S.C. § 707(b)(2), that granting the Debtor a discharge

is an abuse of Chapter 7 of the Bankruptcy Code when the Debtor has sufficient disposable income

to repay her unsecured creditors at least $166.67 per month. The United States Trustee asserted,

*inter alia,* that the Debtor's housing expense deduction should be limited to $664.00 per month, a

standardized amount under the IRS Standards, and that the Debtor had $1,057.34 in monthly

disposable income after the elimination of improper deductions from income in Debtor's Form 22A.

In the event that this Court does not find that a presumption of abuse arises under § 707(b)(2) or finds that such presumption has been rebutted, the United States Trustee seeks dismissal of this case under § 707(b)(3) as the totality of the circumstances of the Debtor's financial situation demonstrates abuse of Chapter 7.

### STATEMENT OF FACTS

The Debtor filed a voluntary Chapter 7 petition on March 5, 2007, and identified herself on the petition as an individual with primarily consumer debts. The Debtor has no dependents and was living in Livonia, Michigan. (Doc. No. 1).

On March 5, 2007, the Debtor also filed bankruptcy schedules, a Form 22A and a Chapter 7 Individual Debtor's Statement of Intention (Doc. Nos. 1, 6 and 7 respectively). Debtor disclosed the following:[1]

1.     Schedule A - Real Property: Ownership of a residence located at 9033 Henry Ruff Rd., Livonia, Michigan;

2.     Schedule D - Creditors Holding Secured Claims: Indebtedness for her residence secured by a first mortgage of $153,109.00, an undersecured second mortgage of $27,291.00; and a "statutory lien" of the Wayne County Treasurer in the amount of $1,096.73.

3.     Chapter 7 Individual Debtor's Statement of Intention: Debtor affirmatively indicated her intent to surrender her real estate at 9033 Henry Ruff Rd., Livonia, Michigan.

As of the March 13, 2007, Debtor was six months in default on the first mortgage on her real property according to a Motion for Relief from the Automatic Stay filed by Deutsche Bank National Trust Company. (Doc. No. 11). The Debtor did not oppose the motion, and on April 3, 2007, the bankruptcy court granted Deutsche Bank National Trust Company relief from the stay, authorizing

---

[1] On her Schedule F, Debtor listed  unsecured, nonpriority debts totaling $15,666.00; deficiency claims of $12,216.73 are included on Schedule D; no unsecured priority claims are listed on Schedule E.

it to "commence or continue its federal and/or state law rights to the property." (Doc. No. 15). On Line 42 of her Form 22A, the Debtor subtracted from her Current Monthly Income her monthly mortgage payments totaling $2,151.00, even though she had not made a payment on the first mortgage nor, presumably, on the second mortgage since September 13, 2006 at the latest. She also subtracted $100.00 allegedly due the Wayne County Treasurer on Line 42.

The United States Trustee, after reviewing all materials filed by the Debtor pursuant to 11 U.S.C. § 704, completed its own means test analysis. The United States Trustee excluded Debtor's mortgage payments of $2,051.00 and the monthly sum of $100.00 allegedly due Wayne County on the residence Debtor was surrendering on Line 42, and instead allowed Debtor a mortgage/rent expense in the amount of $664.00 under the Local Standards for housing and utilities issued by the Internal Revenue Service.[2] The United States Trustee concluded, based on the Debtor's stated intentions, that the Debtor has monthly disposable income of $1,057.34. Thus, the presumption of abuse arises.[3]

At the § 341(a) Meeting of Creditors held April 12, 2007, the Debtor's testimony indicated that many of the projected expenses on her Schedule J were overstated and that she possessed the ability to make meaningful payments to her creditors. A transcript of the § 341(a) Meeting of Creditors is attached hereto as Exhibit A.

The United States Trustee filed a Statement of presumed Abuse (Doc. No. 20), as required by 11 U.S.C. § 704(b)(1)(A), on April 20, 2007 and a Motion to Dismiss the Debtor's bankruptcy case on May 17, 2007, asserting that pursuant to § 707(b)(2) the case was presumptively abusive or

---

[2] Based on a debtor's county of residence and family size, on line 20B of Form 22A a debtor may deduct the IRS Housing and Utility Standard: mortgage/rental expenses.

[3] In fact, according to the United States Trustee's calculations, the Debtor has sufficient disposable income to repay her Schedule D deficiency claims and Schedule F unsecured, nonpriority claims in full in a 27-month repayment plan.

07-44312-swr    Doc 28    Filed 06/20/07    Entered 06/20/07 08:19:15    Page 3 of 28

alternatively, the totality of the circumstances of Debtor's financial situation demonstrated abuse of the provisions of Chapter 7. (Doc. No. 23). The Debtor filed a response[4] to the motion on May 31, 2007. (Doc. No. 24).

## STATEMENT OF APPLICABLE LAW

On October 17, 2005, most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), S. 256, Pub. L. No. 109-8, 119 Stat. 23, took effect, implementing significant changes to the Bankruptcy Code. As part of this effort, Congress amended § 707(b) of the Bankruptcy Code, which governs dismissal of chapter 7 bankruptcy cases. There is now a new presumption: a case is an "abuse" of chapter 7 if a detailed mathematical formula set out in the statute, commonly referred to as the "means test," yields a threshold amount of monthly disposable income. *See* 11 U.S.C. § 707(b)(2).

The means test calculates a debtor's "current monthly income," as defined under 11 U.S.C. § 101(10A), based on the debtor's average income for the six calendar months preceding the month of the bankruptcy filing ("CMI"). If the debtor's CMI is above the applicable state median family income,[5] 11 U.S.C. § 707(b)(2)(A) calculates the debtor's monthly disposable income available to

---

[4] The parties appear to agree that whether or not the presumption of abuse arises turns on whether the Debtor was entitled to an expense allowance for the disputed issue relating to the application of the means test, specifically the average payments to secured creditors, on Line 42 of Form 22A.

[5] If the debtor's annualized CMI falls below the applicable state median family income, the 11 U.S.C. § 707(b)(7) precludes a "judge, United States trustee ... trustee, or other party in interest" from moving to dismiss a bankruptcy case based on the presumption of abuse under 11 U.S.C. § 707(b)(2). *In re Paret*, 347 B.R. 12, 14 (Bankr. D. Del. 2006).

repay creditors by reducing CMI by amounts in certain categories of expenses identified in 11 U.S.C. § 707(b)(2)(A)(ii), (iii), and (iv).[6]

If a debtor's monthly disposable income, after reducing CMI by allowed expenses under 11 U.S.C. § 707(b)(2)(A) (I) - (iv), is less than $100 per month ($6,000 over 60 months), the presumption of abuse does not arise.[7] 11 U.S.C. § 707(b)(2)(A)(I). If a debtor's monthly disposable income equals or exceeds $167 per month ($10,000 over 60 months), the presumption of abuse arises. *Id.* If the debtor's monthly disposable income is between $100 and $167 per month (between $6,000 - $10,000 over 60 months), the presumption arises if disposable income, over 60 months, is sufficient to pay 25% of debtor's nonpriority unsecured debt. *Id.*

If the presumption of abuse arises, a debtor may only rebut that presumption by demonstrating special circumstances as set forth in 11 U.S.C. § 707(b)(2)(B)(i).

Code § 707(b)(3) provides:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider--

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

Therefore, dismissal of a chapter 7 case pursuant to § 707(b)(3) may be based upon abuse demonstrated by bad faith or the totality of the circumstances of the debtor's financial situation

---

[6] Each debtor in chapter 7 with primarily consumer debts is required to file, in conjunction with his bankruptcy schedules and statement of financial affairs, a Statement of Current Monthly Income and Means Test Calculation, Official Form 22A ("Form 22A"). 11 U.S.C. § 521 and § 707(b)(2)(c). In Chapter 7 cases the main purpose of the Form 22A is to calculate monthly disposable income (ability to pay), following the formula set forth in 11 U.S.C. § 707(b)(2), in order to determine whether the presumption of abuse arises.

[7] Pursuant to 11 U.S.C. § 104, the dollar amounts set forth in Title 11 and applicable to the threshold amounts for determining when the presumption of abuse arises under the means test will be adjusted based on the consumer price index for cases filed on or after April 1, 2007. This case is not subject to the dollar amount adjustments.

where the presumption of abuse under § 707(b)(2)(A)(I) does not arise or has been rebutted. BAPCPA replaced dismissal based upon "substantial abuse" under pre-BAPCPA § 707(b) with a mere "abuse" standard. Under pre-BAPCPA law substantial abuse could be found where a debtor had sufficient income to repay a portion of her debts. See, *Behlke v. Eisen (in re Behlke)*, 358 F.3d 429 (6th Cir. 2004) and *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989). A debtor's ability to repay a portion of her debt, therefore, continues to be grounds for dismissal under § 707(b)(3).

## **ARGUMENT**

I.  **DISMISSAL OF THIS BANKRUPTCY CASE IS WARRANTED AS A PRESUMPTION OF ABUSE ARISES PURSUANT TO 11 U.S.C. § 707(b)(2) .**

 A.  **While Three Plausible Interpretations Exist for Treatment of Surrendered Property under § 707(b)(2)(A)(iii), Exclusion of Payments is the Better Reasoned Approach and it Comports with the Bankruptcy Code's Existing Framework and Purpose of the Means Test.**

The best interpretation of the means test is that this Debtor is not eligible to claim an expense for post-petition payments to her mortgage creditors, over and above the IRS Housing Standard, because long before she filed her bankruptcy petition she stopped making payments to the mortgage holders. More importantly, the deductions are improper because she unconditionally stated her intent to surrender the property to the secured creditors. *See In re Ray*, 2007, 362 B.R. 680 , 2007 WL 690131, *6 (Bankr. D. S.C. Feb. 28, 2007) ("Debtors [who] have stated their intention to surrender certain personal property, have not undertaken amendment to their statement, nor explained why they might...are not entitled to deduct these 'average monthly payments' from their current monthly income.")

To determine the amounts that can be deducted from CMI under § 707(b)(2)(A)(iii), "we must begin with language of the statute itself." *United States v. Thunder Hawk*, 127 F.3d 705, 707

(8th Cir. 1997) quoting *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242 (1989). "[T]he Court must give meaning and import to every word in a statute." *In re Jass*, 340 B.R. 411, 415 (Bankr. D. Utah 2006) (citing *Negonscott v. Samuels,* 507 U.S. 99, 206 (1993)). As the Supreme Court has stressed, however, "statutory construction is a 'holistic endeavor.'" *Koons Buick Pontiac GMA, Inc. v. Nigh*, 543 U.S. 50, 60 (2004)(quoting *United Sav. Assn. of Texas v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 371 (1988)). 11 U.S.C. § 707(b)(2)(A)(iii) provides:

> [t]he Debtor's average monthly payments on account of secured debts shall be calculated as the sum of -
>
> (I)     the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition; and.
>
> (II)    any additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents, that serves as collateral for secured debts;
>
> divided by 60.

At issue here is whether the Debtor qualifies for an expense allowance for average monthly future payments on account of secured debts under subsection (I), and under subsection (II), amounts necessary to cure default and maintain possession of the real estate, if the Debtor were filing a Chapter 13 plan. Three distinct judicial approaches have emerged regarding the meaning of § 707(b)(2)(A)(iii) as applied to payments on collateral the Debtor intends to surrender. Thus, there are three plausible meanings of the same statutory provision. *See In re Ray*, 2007 WL 690131 at *3.

Some courts have concluded that debtors are allowed the deduction of expense amounts for secured debts notwithstanding that the debtor has surrendered, or has indicated an intent to surrender, the collateral for those debts. *See, e.g., In re Walker*, 2006 WL 1314125 at *6, 8 (Bankr. N.D. Ga.,

May 1, 2006) (while calling the United States Trustee's position "sensible," holding that debtors may deduct secured debt payments even if committed to surrendering the property); *In re Mundy*, 2007 WL 620971, *5 (Bankr. M.D. Pa. March 1, 2007); *In re Hartwick*, 352 B.R. 867, 868-69 (Bankr. D. Minn. 2006).

*Walker* and its progeny hold that the meaning of the phrase "scheduled as contractually due" permits debtors to reduce CMI for payments owed pursuant to the underlying contract, regardless of whether the debtor has indicated an intent to surrender, or has surrendered, the property. Using a dictionary definition of scheduled, the *Walker* court concluded that "payments that are 'scheduled as contractually due' are those payments that the debtor will be required to make on certain dates in the future on the contract." *In re Walker*, 2006 WL 1314125 at *3.

This line of cases was succinctly analyzed and critiqued by the court in *In re Ray*:

> These cases treat the petition date as the relevant snapshot for the determination of deductible secured payments on the means test form, regardless of the intent of the debtor with respect to the collateral. **A problem with these cases is that they come to the same conclusion about the meaning of the statute as would result if the words <u>scheduled as</u> were not present but do so by focusing on those very words.**[8]

*In re Ray*, 2007 WL 690131 at *3 (emphasis added).[9]

A second approach was adopted by the court in *In re Singletary*, 354 B.R. 455, 470 (Bankr. S.D. Tex. 2006). In *Singletary*, the court found that debtor's physical surrender of the collateral to

---

[8] That is, the courts construe the statute as providing for the calculation of the total of all amounts contractually due.... (Footnote in original.)

[9] This line of cases makes two fundamental logical errors in concluding that debtors are allowed to reduce CMI for payments owed pursuant to an underlying contract, regardless of whether the debtor has indicated an intent to surrender the property. First, it incorrectly applies a dictionary definition to the term "scheduled as contractually due" in § 707(b)(2)(A)(iii), assuming that such term means simply "to plan for a certain date." Congress used the phrase "scheduled as" several times in the Bankruptcy Code to refer not to the common dictionary meaning of the word schedule (i.e. to plan for a certain date), but rather to whether a debt is identified on a debtor's bankruptcy schedules. *See, e.g.,* 11 U.S.C. § 1111(a). Second, this rationale is premised on an incorrect understanding of how monthly expenses are to be computed under the means test. While the means test does require consideration of historical income data looking back six months from the date of filing, *expenses*, on the other hand, are forward looking. *See In re Love*, 350 B. R.611, 614 (Bankr. M.D. Ala. 2006).

the secured creditor terminated the creditor's secured status for purposes of § 707(b)(2)(A)(iii), with the motion to dismiss filing date measuring the deadline for physical surrender. The holding in *Singletary* stands for the proposition that post-petition actions by the debtor impacts the meaning of "scheduled as contractually due." *See In re Ray*, 2007 WL 690131 at *3.

A third line of cases has concluded, as the United States Trustee advocates, that where a debtor has surrendered or intends to surrender the collateral, the debtor may not deduct the monthly amounts owed on the secured obligations. *See, e.g., In re Skaggs*, 349 B.R. 594 (Bankr. E.D. Mo. 2006)("scheduled as" means whether scheduled in debtor's bankruptcy case, and payments on property to be surrendered is not scheduled as due in the 60 months following petition date); *In re Harris*, 353 B.R. 304, 309-10 (Bankr. E.D. Okla. 2006) (following *Skaggs*).[10]

There are thus three plausible interpretations, but one of the interpretations aligns more closely with the purpose of the means test as a measure of the debtor's ability to pay. The deduction at issue, i.e., **amounts scheduled as contractually due**, is "for 'average monthly payments on account of secured debts' and is calculated according to a formula that looks to the '60 months following the date of the petition.'" *In re Ray*, 2007 WL 690131 at *5. All of the words in § 707(b)(2)(A)(iii) must be read together as a whole, and none of the terms in that provision may be ignored. *See In re Welzel*, 275 F.3d 1308, 1317 (11th Cir. 2001), quoting *Philbrook v. Glodgett*, 421 U.S. 707, 713 (1975)("In interpreting one part of a statute, 'we must not be guided by a single

---

[10] The court in *In re Ray* further discussed how neither the definition of "scheduled" nor the legislative history of BAPCPA are necessarily of aid to the courts in addressing surrendered property:

> A resort to the dictionary reflects that "schedule" has multiple meanings including "plan for a certain date" from *Walker*, "appended to a document" as in bankruptcy schedules from *Harris* and several other definitions. The legislative history, such as it is, is of little help in that it largely repeats the statutory text. (Citations omitted.) The meaning of "schedule" and "scheduled" elsewhere in the Bankruptcy Code is of little use as there are multiple meanings and the meaning is perhaps more apparent in the different context in which the words appear. (Citation omitted.)

*In re Ray*, 2007 WL 690131 at *4 (citations omitted).

sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'").

> These phrases are best construed together as contemplating a *forward looking* calculation:

> **It therefore seems that the better construction of "scheduled as contractually due" would consider the debtors' intention to surrender the collateral and make no future payments to the creditor**. This construction would not support deduction of average secured credit payments on debt secured by collateral that the debtor proposes to surrender. This construction is also in keeping with the overall purpose of establishing a formula that will give rise to a meaningful presumption of abuse or not. **In considering whether debtors are abusing chapter 7 it is proper to construe the statute in such a way as to determine whether they have an ability to repay their general unsecured creditors once they have carried out their stated intentions**.

*In re Ray*, 2007 WL 690131 at *5. Because property surrendered or to be surrendered will not have payments due in any of the 60 months following the date of the petition, when § 707(b)(2)(A)(iii) is properly applied these payments cannot be deducted on the means test.[11]

Importantly, the Debtor has unequivocally stated her intent to surrender her real property. Additionally, her actions in the bankruptcy case, including acquiescing in the creditor's efforts to obtain relief from the automatic stay, evidence that intent. Some courts have criticized reliance on the statement of intention because of possible amendments a debtor may make to it. However, there are deadlines that require a debtor both to file a statement of intention and then perform such intent promptly. 11 U.S.C. § 521(a)(2)(A)(B). Moreover, "gamesmanship with the statement of intention could well impact the dismissal analysis under § 707(b)(3) and certainly is not a sound basis for grounding an interpretation of the secured debt payment deduction under the means test." *In re Ray*, 2007 WL 690131 at *6.

---

[11] This same rationale applies, albeit more forcefully, for chapter 13 arrearage payments under § 707(b)(2)(A)(iii)(II). For the debtor who is surrendering collateral to the secured party, as here, <u>no payment</u> can be made in a chapter 13 case which will allow the debtor to retain the collateral.

10

Code § 707(b)(2)(A)(iii) must be read in its entirety. The Debtor should not be allowed a monthly expense deduction for mortgage payments that will never be made and which the mortgage holders are recovering through foreclosure. The best reasoned approach and most plausible reading of the statute, excludes as secured payments those on property to be surrendered, does not ignore the reality of the situation, and is consistent with BAPCPA's purpose – to ensure that debtors who can afford to pay their debts do so.

**B.     BAPCPA'S Framework Supports Exclusion of Expense Amounts on Secured Debt Payments for Property to be Surrendered.**

Analysis of the means test generally, and section 707(b)(2)(A)(iii) in particular, is underpinned by Congress' general goal behind the complete overhaul of § 707(b), i.e., ensuring "that those who can afford to repay some portion of their unsecured debts be required to do so... ." 151 CONG. REC. S2470 (March 10, 2005). The means test has been fashioned to accomplish this goal, in part, by reducing the court's discretion in deciding whether to dismiss a case when disposable income is available as calculated through application of § 707(b)(2)'s means test. *See In re Devilliers*, 358 B.R. 849 (Bankr. E.D. La. 2007) (BAPCPA "incorporated a mechanical test designed to determine if a chapter 7 debtor could presumably repay unsecured claimants through a chapter 13 plan").[12]

Section 707(b)(2)'s means test helps to "'ensure that debtors repay creditors the maximum they can afford,' a primary goal of BAPCPA." *In re Lenton*, 358 B.R. 651(Bankr. E.D. Pa. 2006), *quoting* H.R. Rep. 109-31, pt. 1 at 1, *as reprinted in* 2005 U.S.C.C.A.N. 88, 89 (2005). It is a device that identifies debtors who have sufficient funds (disposable income) by directing them to either

---

[12] Limited discretion is provided to the court, however, to determine whether "special circumstances" exist in order to rebut the presumption of abuse under § 707(b)(2)(B). The Debtor herein has not asserted the existence of special circumstances, and, accordingly they are not at issue in this matter. Section 707(b)(3) also provides a discretionary basis for the court to dismiss a case if the presumption in § 707(b)(2) does not arise or has been rebutted. The United States Trustee's motion to dismiss herein seeks relief based alternatively on § 707(b)(2) or (3).

voluntarily proceed in chapter 13 or be dismissed out of bankruptcy entirely. Excluding expense allowances for monthly payments the Debtor will not make provides a more reliable estimate of what the means test is designed to measure, the Debtor's ability to pay.

If debtors are permitted to deduct secured debt expenses on surrendered property, § 707(b)(2) will not operate as the mechanical gatekeeper to chapter 7 that Congress intended. Rather, many debtors would "pass" through the means test because of being allowed expense deductions for non-existent payments on surrendered collateral, and their case would be considered for dismissal only under the discretion-driven totality of the circumstances analysis set forth in § 707(b)(3)(B). *In re Mundy*, 2007 WL 620971, *5 (Bankr. M.D. Pa. March 1, 2007).

Allowing a debtor to deduct more than the IRS Expense Standard for housing expenses even though the debtor will not expend this higher amount, defeats the purpose of the means test. Cases would avoid means test review and the court would have discretion to consider, as an initial matter, whether the debtor's filing constitutes an abuse under the totality of the circumstances. *See* 11 U.S.C. § 707(b)(3) (only if the presumption of abuse does not arise or is rebutted may dismissal be considered under totality of the circumstances). This would be precisely the opposite of how the statute was designed to function and what Congress intended.

Excluding secured debt payments on property to be surrendered does not alter the "mechanical" operation of the means test. Moreover, the rule on surrender is easy to apply under any of the plausible interpretations. The only current uncertainty is not knowing which of the three

interpretations to apply.[13]  In completing Form 22A, the objective is for the Debtor to provide an assessment of the amount of monthly disposable income available and whether it is above the threshold amount deemed to be a meaningful repayment to unsecured creditors. This estimate is designed to steer debtors who have monthly disposable income above the threshold amount to file their petition under chapter 13 instead of under chapter 7.  *In re Barraza*, 346 B.R.724, 729 (Bankr. N.D. Tex. 2006).

For the means test to have any utility, the Debtor should be required to estimate the residual income available each month after the deduction of the **projected** monthly expenses at the time the case is filed.  There would be no utility in permitting debtors to calculate their repayment ability by including past expense amounts that are not projected for future payment.  Rather, debtors who do not have a monthly mortgage payment are allowed to take as a monthly expense, the amount set forth in the IRS Local Housing Standards for a family the size of the debtor's located in the same county. Allowing debtors to take secured debt expense deductions for collateral surrendered or to be surrendered  is contrary to the better reasoned reading of § 707(b)(2)(A)(iii),  frustrates the purpose of  the  mean test,  and ignores   BAPCPA's framework.   The Debtor has asserted no special circumstances to rebut the presumption of abuse.  The United States Trustee's motion to dismiss this bankruptcy case pursuant to 11 U.S.C. 707(b)(2) should be granted.

---

[13] Exclusion of payments for surrendered property will not result in uncertainty , such as debtors who intend to surrender and later redeem or reaffirm their secured property.  *See In re Ray*, 2007 WL 690131 at *6 (the limitations on debtor's ability to deal with secured property do not permit unending equivocation by the debtor).  Further, if Debtor's case is dismissed and she later elects to redeem the real estate, or if monthly payments on the redemption financing eliminate her ability to pay her debts, the debtor may file another case under chapter 7.  See 11 U.S.C. § 349; 11 U.S.C. § 109(g).  Alternatively, if the Debtor elects to convert her case to Chapter 13 and redeem the property, she could include redemption financing payments in her Chapter 13 plan.

## II. DISMISSAL OF THIS BANKRUPTCY CASE PURSUANT TO 11 U.S.C. § 707(b)(3) IS PROPER IN THE EVENT THAT THIS COURT DETERMINES THAT A PRESUMPTION OF ABUSE DOES NOT ARISE HEREIN PURSUANT TO 11 U.S.C. § 707(b)(2) OR THAT SUCH PRESUMPTION HAS BEEN REBUTTED.

In the event that the Court determines that no presumption of abuse arises in this matter or that it has been rebutted, dismissal of this case remains proper pursuant to 11 U.S.C. § 707(b)(3) based on the ability of the Debtor to repay a significant portion, if not all, of her deficiency claims and unsecured nonpriority debts.

Debtor's Schedule I, filed with the Court on March 5, 2007, discloses current net monthly take-home pay of $2,699.71. Schedule J, also filed on March 5, 2007, discloses current total monthly expenses of $2,670.00 and a net monthly surplus of $29.71. Debtor's Schedule J includes, at Line 1, estimated rental expenses of $1,200.00 that will arise in view of Debtor's intention to surrender her home. As noted above, an order was entered by the Court on April 3, 2007 granting relief from the automatic stay for the benefit of the holder of the mortgage on Debtor's home. Debtor testified at her § 341(a) Meeting that she had already investigated the cost of an apartment rental and expects to pay no more than $1,000.00 per month for such when she must vacate her home in August of this year. Accordingly, it is proper to assume that Debtor will actually have an additional $200.00 to add to her surplus. Alternatively, it is proper to assume that the cost of a replacement residence for the Debtor will equal the IRS mortgage/rental expense of $664.00 allotted debtors in households of one or two people in Wayne County, MI pursuant to 11 U.S.C. § 707(b)(2)(A)(ii)(I). *See Office of U.S. Trustee v. Welch,* 344 B.R. 50,53 (Bankr. M.D. Penn. 2005). *Welch* is a pre-BAPCPA case involving former § 707(b), the predecessor of current § 707(b)(3). The Court stated "(w)hile ... application of [the standards] is not mandatory in the case before me, reference to those standards is a useful tool in determining whether a debtor's expenses are reasonable and necessary." Therefore, the estimated

housing expense of $1,200.00 on Line 1 of Debtor's Schedule J is overstated by at least $200.00 and

as much as $536.00.

The Debtor's Response to the united States Trustee's Motion to dismiss takes issue with the

foregoing and asserts:

> "(t)he Trustee claims that the Debtor stated that she expects to pay $1000 and hence
> her rental expense should be no more than $1000. However, the Debtor actually
> stated that she expects to pay around $1000. The Debtor's listed estimate of $1200
> is reasonably around $1000. Additionally, the Debtor was asked this question as she
> was leaving the meeting, and was clearly caught off guard. This lends more credence
> to the fact that the debtor did not answer this question with a well thought out
> estimate, but with a ball park figure. Therefore, her response at this meeting does
> nothing to undermine and serves only to validate this figure further."

The debtor's argument is largely comprised of *non sequiturs.* The assertion that the Debtor was

questioned about her housing expenses "as she was leaving the meeting, and was clearly caught off

guard" can most charitably be described as inaccurate. The Transcript of the § 341(a) Meeting of

Creditors includes the following examination of the Debtor by counsel for the United States Trustee

at pp 5-7:

> Q.   Ms. Kelley, you're going to surrender the home on Ruff – Henry Ruff Road?
> A.   Yes.
> Q.   Okay. You're still living there now?
> A.   Correct.
> Q.   Okay. Has it been foreclosed upon?
> A.   Yes.
> Q.   When did that occur?
> A.   Well, they had a sheriff's sale.
> Q.   Oh. But you're still living there now?
> A.   Yes.
> Q.   Okay. You've got how much longer to live there?
> A.   Till the end of August.
> Q.   Okay. There's been no change in your employment? You remain employed at H. J. Olin?
> A.   Yes.
> Q.   Okay. Any change in your salary?
> A.   No.
> Q.   On Schedule J. you've got a figure of $1,200 for rent or home mortgage. Is that – that's an estimate I take it?

| A. | Yeah.  It was – it's actually 1,450. |
|---|---|
| Q. | Well, 1,450 – |
| A. | Was my house note. |
| Q. | Okay.  But I mean where did the $1,200 – you're not paying that I take it. |
| A. | Oh, no. |
| Q. | Okay.  Where did the $1,200 figure come from? |
| A. | My attorney put that in there. |
| Q. | Oh.  I see.  Okay |
| A. | For the payment. |
| Q. | I'm sorry? |
| A. | I don't understand. |
| Q. | Where do you intend to live when you leave your home on Henry Ruff Road? |
| A. | Oh, I have to find an apartment or live with someone. |
| Q. | Okay. Do you have any idea how much that's going to cost? |
| A. | I've been looking around at this time, and it's going to be up to $1,000 or so. |
| Q. | Okay.  Is that for an apartment? |
| A. | Yes. |
| Q. | What do you think your utilities are going to cost? |

***

| A. | Just based on how I'm paying them now, my utilities are $70 for electric and like – my last month's bill was 120 some dollars for heat. |

***

| Q. | That's for your present home; right? |
|---|---|
| A. | Right |
| Q. | What do you expect that will be in an apartment? |
| A. | I – I'm not really sure. |

The questioning of the Debtor by counsel for the United States Trustee took place after the Debtor was examined by her attorney and prior to her examination by the case trustee, in the middle of the § 341 Meeting while the Debtor was seated at the table in the meeting room.  The United States Trustee's motion relies upon no statement of the Debtor other than her sworn testimony at the § 341(a) Meeting.  The Debtor clearly stated that she had "been looking around" and that the cost of an apartment would "be up to $1,000 or so," i.e., she expected the maximum to be approximately $1,000.00.

The Debtor's Response to the United States Trustee's Motion actually asserts that "the debtor has investigated replacement residences and found that the actual rental expense can be reasonably estimated to $1200 (sic)."  This is to some extent amusing in light of the Debtor's

testimony in response to the inquiry as to where the $1,200.00 figure came from: "(m)y attorney put that in there." Overall, however, the Debtor's misrepresentations, in her Response to the United States Trustee's motion, of the circumstances surrounding her testimony is unfortunate, to say the least.

The Debtor's Response to the United States Trustee's Motion also takes issue with the United States Trustee's assertion that the utility expenses asserted on her Schedule J are unreasonably high. The Debtor's testimony that her March 2007 electricity and heating bill for her house totaled $190.00 and that she was "not really sure" what these expenses would be in an apartment demonstrate, as does common sense, that $225.00 per month for electricity and heating fuel for an apartment for one person is grossly excessive. A water and sewage expense of $30.00 per month also appears unrealistic in view of the common practice in this area of such charges being included in the rental cost of apartments. Finally, the United States Trustee asserts that the alleged monthly home maintenance expense of $50.00 should be reduced to zero based on the lack of any such expense generally arising in a rented apartment.

The Debtor's ability to make a meaningful, or even full payment, on her scheduled deficiency claims and unsecured nonpriority claims warrants the dismissal of this case pursuant to Code § 707(b)(3) as an abuse of the provisions of Chapter 7 in the event that the Court determines that no presumption of abuse arises under § 707(b)(2) or that such presumption has been rebutted.

## <u>CONCLUSION</u>

For all these reasons, the United States Trustee respectfully requests that this Court enter an order dismissing this case and granting such further relief as may be just and appropriate.

Respectfully submitted,

**SAUL EISEN**
**UNITED STATES TRUSTEE**
Michigan/Ohio Region 9

By:     <u>/s/ David K. Foust (P23450)</u>
        David.K.Foust@usdoj.gov
        Trial Attorney
        Office of the U.S. Trustee
        211 West Fort Street - Suite 700
        Detroit, Michigan 48226

Dated: June 20, 2007

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In re:                                          Case No. 07-44312-SWR

**DEBRA L. KELLEY,**                            Chapter 7

      Debtor.                                   HON. STEVEN W. RHODES
_____/


## **EXHIBIT LIST**

Exhibit A      Transcript of April 12, 2007 § 341(a) Meeting of Creditors

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


In the matter of:

DEBRA KELLY,                        Case No. 07-44312

                                    Detroit, Michigan
                                    Thursday, April 12, 2007
                                    Judge Rhodes

            Debtor
_____/

                        341 HEARING

          BEFORE GENE KOHUT, CHAPTER 7 TRUSTEE

      TRANSCRIPT ORDERED BY:  DAVID K. FOUST (Office of the
                    United States Trustee)

APPEARANCES:

For the Debtor:                Thav & Ryke
                               BY:  SARAH VORGITCH
                               29200 Northwestern, Suite 155
                               Southfield, MI  48034


For the U.S. Trustee:          Office of the U.S. Trustee
                               BY:  DAVID K. FOUST
                               211 W. Fort St., Suite 700
                               Detroit, MI  48226


Transcribed by:                Lynn L. Simmons
                               8284 Caribou Trail
                               Clarkston, MI  48348
                               248-922-1587

<u>TABLE OF CONTENTS</u>

PROCEEDINGS - Thursday, April 12, 2007                          3

DEBTOR WITNESS:   **Debra Kelly**

    Examination by the trustee                          3
    Appearance by Ms. Vorgitch                          4
    Examination by Mr. Foust                            5
    Examination by the trustee                          8

2

1            Detroit, Michigan

2            Thursday, April 12, 2007

3            10:00 A.M. Call

4            _ _ _

5            THE TRUSTEE:  All right.  Recalling case number 07-

6      44321, Debra Kelly.  Raise your right hand, please.

7            DEBRA KELLY, DEBTOR, SWORN

8            THE TRUSTEE:  All right.  Please be seated.

9            **<u>EXAMINATION</u>**

10     BY THE TRUSTEE:

11     Q.   Did you have an opportunity to read and review the

12     bankruptcy information sheet?

13     A.   I did.

14     Q.   Did you understand it?

15     A.   (No audible response.)

16     Q.   All right.  Can I see some identification, please.

17            MS. VORGITCH:  She does not have her Social Security

18     card.  She has her bank card for check identification.

19            THE TRUSTEE:  You don't have a tax return?

20            MS. VORGITCH:  Actually, I have a copy of the tax

21     return.

22            THE TRUSTEE:  May I see that.

23            MS. VORGITCH:  Yes.

24       (Discussion off the record.)

25     BY THE TRUSTEE:

3

1  Q.   All right, ma'am, what's your name?

2  A.   Debra Kelly.

3  Q.   Where do you live?

4  A.   9033 Henry Ruff Road, Livonia, 48150.

5       THE TRUSTEE:  And counsel, for the record?

6       MS. VORGITCH:  Sarah Vorgitch on behalf of the

7  Debtor.

8  BY THE TRUSTEE:

9  Q.   All right.  I'm going to return to you your picture I.D.

10 and 2005 tax return.  The information matches that on the

11 schedules.  Your attorney is going to show you a bankruptcy

12 petition filed on your behalf electronically.  Can you

13 identify for me if that is your signature on there, ma'am?

14 A.   Yes.

15 Q.   Okay.  So you have read all the information in those

16 schedules?

17 A.   Yes.

18 Q.   Everything in there is true and correct?

19 A.   (indiscernible)

20 Q.   Everything -- my question was is everything in there true

21 and correct?

22 A.   Oh, yes.

23 Q.   All right.  As you sit here today, since the time you

24 signed those schedules, does all that remain true and correct?

25 A.   Yes.

4

1  Q.   Okay.  Any changes that have occurred in your situation

2  since the time you filed this that you need to bring to my

3  attention?

4  A.   No, sir.

5  Q.   What is the reason you had to file this bankruptcy?

6  A.   I changed jobs and was laid off for eight months, and

7  then found another job making 20,000 less than I was

8  previously.

9  Q.   So that where you're working right now you're making

10  20,000 less than you were?

11  A.   Yes.

12          THE TRUSTEE:  All right.  Mr. Foust.

13          MR. FOUST:  David Foust on behalf of the United

14  States Trustee.

15                    **<u>EXAMINATION</u>**

16  BY MR. FOUST:

17  Q.   Ms. Kelly, you're going to surrender the home on Ruff --

18  Henry Ruff Road?

19  A.   Yes.

20  Q.   Okay.  You're still living there now?

21  A.   Correct.

22  Q.   Okay.  Has it been foreclosed upon?

23  A.   Yes.

24  Q.   Okay.  When did that occur?

25  A.   Well, they had a sheriff's sale.

5

1   Q.   Oh.  But you're still living there now?

2   A.   Yes.

3   Q.   Okay.  You've got how much longer to live there?

4   A.   Till the end of August.

5   Q.   Okay.  There's been no change in your employment?  You

6  remain employed at H.J. Olin?

7   A.   Yes.

8   Q.   Okay.  Any change in your salary?

9   A.   No.

10  Q.   On Schedule J you've got a figure of $1,200 for rent or

11  home mortgage.  Is that -- that's an estimate I take it?

12  A.   Yeah.  It was -- it's actually 1,450.

13  Q.   Well, 1,450 --

14  A.   Was my house note.

15  Q.   Okay.  But I mean where did the $1,200 -- you're not

16  paying that I take it.

17  A.   Oh, no.

18  Q.   Okay.  Where did the $1,200 figure come from?

19  A.   My attorney put that in there.

20  Q.   Oh.  I see.  Okay.

21  A.   For the payment.

22  Q.   I'm sorry?

23  A.   I don't understand.

24  Q.   Where do you intend to live when you leave your home on

25  Henry Ruff Road?

6

1    A.    Oh, I have to find an apartment or live with someone.

2    Q.    Okay.  Do you have any idea how much that's going to

3    cost?

4    A.    I've been looking around at this time, and it's going to

5    be up to $1,000 or so.

6    Q.    Okay.  Is that for an apartment?

7    A.    Yes.

8    Q.    What do you think your utilities are going to cost?

9          (Discussion off the record.)

10          THE WITNESS:  Just based on how I'm paying them now,

11   my utilities are $70 for electric and like -- my last month's

12   bill was 120 some dollars for heat.

13   BY MR. FOUST:

14   Q.    That's for your present home; right?

15   A.    Right.

16   Q.    What do you expect that will be in an apartment?

17   A.    I -- I'm not really sure.

18   Q.    Okay.

19   A.    I haven't really started looking.

20   Q.    Okay.  You also have a figure of $50 a month for home

21   maintenance.  What is that based on?  On Schedule J, line 3.

22   I'll show this to you if you'd like.

23   A.    I must have been just taking that off of what I have been

24   doing at my house.  So --

25   Q.    What -- what would that include?

7

1   A.   I had to have the hot water tank repaired.

2           MR. FOUST:   Okay.   I have no further questions.

3   Thanks.

4                          **EXAMINATION**

5   BY THE TRUSTEE:

6   Q.   Ma'am, does anybody owe you any money?

7   A.   I wish.   No.

8   Q.   Are you suing anybody to collect any money?

9   A.   No, sir.

10  Q.   Personal injury lawsuits, slip and falls, workers comp,

11  anything like that?

12  A.   No.

13  Q.   Have you sued anybody in the last five years?

14  A.   No, sir.

15  Q.   Have you ever owned or operated a business before?

16  A.   No, sir.

17  Q.   Have you given away any property to anybody in the last

18  year?

19  A.   No, sir.

20  Q.   Have you filed any claims with any insurance companies to

21  which you're entitled to receive any money?

22  A.   No, sir.

23  Q.   Have you transferred any balances on any credit cards

24  within the last six months?

25  A.   No, sir.

8

1 Q.   Taken any cash advances on any credit cards?

2 A.   No, sir.

3 Q.   Okay.  You're not a party to any probate proceedings

4 where you're entitled to receive any money or property?

5 A.   No.

6 Q.   And you did not own any other real estate?

7 A.   No.

8 Q.   And did you file your '06 returns?

9 A.   Actually tomorrow I'll have them.  I've got everything

10 together to file.

11 Q.   Okay.  Are you anticipating a refund?

12 A.   No.  I'll have to pay about $4,000.

13         THE TRUSTEE:  All right.  That will conclude your

14 hearing.  You're all set.

15         MS. VORGITCH:  Thank you.

16     (Hearing concluded.)

—  —  —

I certify that the foregoing is a correct transcript of the
proceedings held in the above-entitled matter.


DATED:   June 5, 2007      _____
                           Lynn L. Simmons, Transcriber

9